CASE NO. _____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

*IN RE:* **BAYCARE MEDICAL GROUP, INC. AND**
**ST. JOSEPH'S HOSPITAL, INC.**

**PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES**
**DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA**
**No. 8:21-cv-01891**

**Ceci C. Berman**
Florida Bar No. 329060
**Joseph T. Eagleton**
Florida Bar No. 98492
Brannock Berman & Seider
1111 W. Cass St., Ste. 200
Tampa, FL 33606
Tel: (813) 223-4300
Fax: (813) 262-0604
cberman@bbsappeals.com
jeagleton@bbsappeals.com
Secondary: eservice@bbsappeals.com

**Kevin D. Johnson**
Florida Bar No. 0013749
**Ashley T. Gallagher**
Florida Bar No. 125141
Johnson Jackson PLLC
100 N. Tampa St., Ste. 2310
Tampa, FL 33602
Tel: (813) 580-8400
Fax: (813) 580-8407
kjohnson@johnsonjackson.com
agallagher@johnsonjackson.com
Secondary: lesposito@johnsonjackson.com

*Attorneys for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26-1, Petitioners hereby file their Certificate of Interested Persons and Corporate Disclosure Statement:

1.      BayCare Medical Group, Inc., Defendant/Petitioner;

2.      Berman, Ceci Culpepper, counsel for Defendants/Petitioners;

3.      Brannock Berman & Seider, Law Firm for Defendants/Petitioners;

4.      Cremer, Terin Barbas, counsel for Plaintiff/Respondent;

5.      Drushal, Amy Lea, counsel for Plaintiff/Respondent;

6.      Eagleton, Joseph T., counsel for Defendants/Petitioners;

7.      Gallagher, Ashley T., counsel for Defendants/Petitioners;

8.      Johnson Jackson, PLLC, Law Firm for Defendants/Petitioners;

9.      Johnson, Kevin D., counsel for Defendants/Petitioners;

10.     Jung, William F., The Honorable Judge of the United States District Court, Middle District of Florida;

11.     Loux, Tara J., M.D., Plaintiff/Respondent;

12.     Nayee, Anand, M.D., Defendant;

13.     St. Joseph's Hospital, Inc., Defendant/Petitioner;

14.     Trenam, Kemker, Scharf, Barkin, Frye, O'Neil & Mullis, Law Firm for Plaintiff/Respondent; and

15.     Wilson, Thomas G., The Honorable Magistrate Judge of the United

States District Court, Middle District of Florida.

BayCare Health System, Inc. is the parent corporation of Petitioners BayCare

Medical Group, Inc. and St. Joseph's Hospital, Inc.  No publicly held corporation

owns 10% or more stock in Petitioners or BayCare Health System.

|                                        | */s/Kevin D. Johnson*                          |
| -------------------------------------- | ---------------------------------------------- |
| **Ceci C. Berman**                     | **Kevin D. Johnson**                           |
| Florida Bar No. 329060                 | Florida Bar No. 0013749                         |
| **Joseph T. Eagleton**                 | **Ashley T. Gallagher**                        |
| Florida Bar No. 98492                  | Florida Bar No. 125141                          |
| Brannock Berman & Seider               | Johnson Jackson PLLC                            |
| 1111 W. Cass St., Ste. 200             | 100 N. Tampa St., Ste. 2310                     |
| Tampa, FL 33606                        | Tampa, FL 33602                                 |
| Tel: (813) 223-4300                    | Tel: (813) 580-8400                             |
| Fax: (813) 262-0604                    | Fax: (813) 580-8407                             |
| cberman@bbsappeals.com                 | kjohnson@johnsonjackson.com                     |
| jeagleton@bbsappeals.com               | agallagher@johnsonjackson.com                   |
| Secondary: eservice@bbsappeals.com     | Secondary: lesposito@johnsonjackson.com         |

*Attorneys for Petitioners*

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................C1

Table of Authorities ...................................................................... iii

I.     The Relief Sought ...............................................................2

II.    The Issues Presented ...........................................................3

III.   Facts Necessary To Understand The Issues Presented ........................5

       The Patient Safety and Quality Improvement Act of 2005
       ("PSQIA"). ..................................................................6

       BayCare's PSQIA-compliant patient safety evaluation system............8

       PSQIA's impacts on discovery in this case.........................13

       The district court orders production...................................14

IV.    Reasons Why The Writ Should Issue................................................15

       A.     The district court erred in interpreting PSQIA's text ...............15

              PSQIA provides a broad privilege ............................................16

              BayCare's records here fit within PSQIA's broad privilege ....18

              The district court's analysis of PSQIA ignored the text ..........20

              The district court misapplied the PSQIA privilege...................24

       B.     The district court erred when it nullified the PSQIA privilege
              based on a policy concern about Dr. Loux's ability to conduct
              discovery .................................................................27

       C.     The district court's ruling created immediate and irreversible
              harm that is not mitigated by the existence of a protective
              order .......................................................................28

V.    Conclusion ................................................................................ 31

Certificate of Compliance .................................................................. 32

Certificate of Service ........................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

Carpenter v. Mohawk Indus., Inc.,

    541 F.3d 1048 (11th Cir. 2008) .........................................................2

Charles v. S. Baptist Hosp. of Fla., Inc.,

    209 So. 3d 1199 (Fla. 2017) ............................................... 4, 22, 23

Cheney v. U.S. Dist. Ct. for D.C.,

    542 U.S. 367 (2004)...........................................................................2

Cox v. Admin. U.S. Steel & Carnegie,

    17 F.3d 1386 (11th Cir. 1994) ........................................................27

Dence v. Wellpath, LLC,

    No. 1:20-cv-671-CL, 2022 WL 17261990 (D. Or. Nov. 29, 2022) ..............22

Franco v. Yale New Haven Hosp., Inc.,

    2023 WL 2769929 (Conn. Super. Ct. Mar. 31, 2023)....................................17

In re Kellogg Brown & Root, Inc.,

    756 F.3d 754 (D.C. Cir. 2014)...................................................2, 31

In re Papandreou,

    139 F.3d 247 (D.C. Cir. 1998).........................................................31

In re Sec'y, Fla. Dep't of Corr.,

    No. 20-10659-J, 2020 WL 1933170 (11th Cir. Mar. 30, 2020) ......................2

In re Sims,

    534 F.3d 117 (2d Cir. 2008) ...........................................................................31

In re Temple,

    851 F.2d 1269 (11th Cir. 1988) ........................................................................3

In re von Bulow,

    828 F.2d 94 (2d Cir. 1987) .............................................................................31

Lee Med., Inc. v. Beecher,

    312 S.W.3d 515 (Tenn. 2010) .......................................................................16

Mohawk Indus., Inc. v. Carpenter,

    558 U.S. 100 (2009).......................................................................................30

Tallahassee Mem'l Healthcare, Inc. v. Wiles by and through Wiles,

    351 So. 3d 141 (Fla. 1st DCA 2022) ................................................. 4, 16, 25

Tibbs v. Bunnell,

    448 S.W.3d 796 (Ky. 2014).................................................................. 19, 21

Tinal v. Norton Healthcare, Inc.,

    2014 WL 12581760 (W.D. Ky. 2014)............................................................17

**Statutes**

28 U.S.C. § 1292(b) ...............................................................................................15

42 U.S.C. § 299b-21(7)(A) .......................................................................... 3, 8, 18, 19

42 U.S.C. § 299b-21(7)(B) ................................................................................3, 19

42 U.S.C. § 299b-22(a) ......................................................7, 17

Fla. Stat. § 395.0193(2)...................................................... passim

Fla. Stat. § 395.0193(2)(b) ......................................................24

Fla. Stat. § 395.0193(2)(e) ......................................................25

Fla. Stat. § 395.0197(4)-(7)......................................................22

Fla. Stat. § 395.0197(7)............................................................12

**Federal Regulations**

Department of Health Human Services, Patient Safety and Quality Improvement,

    73 Fed. Reg. 70732-01 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3) .. passim

HHS Guidance,

    81 Fed. Reg. 32655-01, 2016 WL 2958759 (May 24, 2016)................. 21, 25

**Other Authorities**

150 Cong. Rec. S8222 (daily ed. July 15, 2004) .................................7, 28

151 Cong. Rec. H6673-01, 2005 WL 1771386 ........................................... 6, 11, 16

151 Cong. Rec. S8713-02, 2005 WL 1703486......................................6, 16

Kathryn Leaman, Let's Give Them Something to Talk About: How the PSQIA

    May Provide Federal Privilege & Confidentiality Protections to the

    Medical Peer Review Process,

    11 Mich. St. U. J. Med. & L. 177 (Winter 2007) ...........................................25

<u>**PETITION FOR WRIT OF MANDAMUS**</u>

Petitioner BayCare Medical Group, Inc. ("BMG") terminated Respondent Tara Loux, M.D. from her employment as a pediatric surgeon after Dr. Loux committed numerous, serious surgical errors involving patients at Petitioner St. Joseph's Hospital, Inc., the hospital where Dr. Loux practiced. Dr. Loux sued BMG and St. Joseph's in the United States District Court for the Middle District of Florida. She brought claims for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990, fraud, breach of contract, and unpaid wages.

In the ongoing litigation below, Dr. Loux moved to compel BMG and St. Joseph's to produce documents that are privileged under the Patient Safety and Quality Improvement Act of 2005 ("PSQIA"). The magistrate judge agreed that the documents are privileged, but the district court overturned that ruling and ordered BMG and St. Joseph's to produce the privileged files. BMG and St. Joseph's timely moved for reconsideration and certification for interlocutory appeal, both of which the district court denied. Because BMG and St. Joseph's have exhausted all other options to protect their privileged records, they now promptly petition for a writ of mandamus under the All Writs Act. <u>See</u> 28 § U.S.C. 1651.

When the district court departed from PSQIA's text to compel production of these privileged documents, it engaged in "a clear usurpation of power or abuse of

discretion." See Carpenter v. Mohawk Indus., Inc., 541 F.3d 1048, 1055 (11th Cir. 2008). This error cannot be remedied in the normal appeals process. See, e.g., In re Kellogg Brown & Root, Inc., 756 F.3d 754, 761 (D.C. Cir. 2014).

Mandamus is proper because no other adequate means exists for BMG and St. Joseph's to protect their privileged files, the right to issuance is clear and indisputable, and the writ is otherwise appropriate under the circumstances. See Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 381 (2004); see also In re Sec'y, Fla. Dep't of Corr., No. 20-10659-J, 2020 WL 1933170, at *1 (11th Cir. Mar. 30, 2020) (noting that mandamus "can be an appropriate remedy for discovery orders which threaten to disclose highly sensitive information").

## I.    THE RELIEF SOUGHT

Petitioners BMG and St. Joseph's seek a writ of mandamus vacating the district court's orders requiring production of documents privileged under PSQIA. (Dkt. Nos. 103, 112, 115).[1] PSQIA establishes a statutory privilege created by Congress to further the overwhelming public interest in healthcare safety. The district court skirted the statutory text, wrongly found the privilege inapplicable, and ordered BMG and St. Joseph's to produce privileged documents involving other physicians who are not parties to this litigation. It is a classic cat-out-of-the-bag

---

[1] Citations to the district court docket will be to the number generated by the CM/ECF system and referenced as (Dkt. No. [###]).

problem, and in this instance, a particularly serious one warranting mandamus relief. The district court's order not only creates immediate harm that cannot be remedied on plenary appeal but makes a finding that will send shockwaves through the healthcare industry with respect to a statute that, to date, has been interpreted sparingly by federal appellate courts. See, e.g., In re Temple, 851 F.2d 1269, 1271 (11th Cir. 1988) (noting that mandamus is appropriate when the issue "raises important and novel questions of law").

## II.    THE ISSUES PRESENTED

This petition presents an important question of statutory interpretation that lacks clear guidance from this Court.

Congress enacted PSQIA in 2005 to decrease the occurrence of medical errors. To encourage healthcare providers to engage in self-critical analysis of patient-safety issues, Congress provided broad privilege protections for documents that reflect the patient-safety deliberations and analysis carried out by healthcare organizations. See 42 U.S.C. § 299b-21(7)(A). The only relevant exception to the PSQIA privilege is for information that is collected, maintained, developed, or in existence "separately" from a healthcare organization's patient-safety evaluation system, such as information a healthcare organization must create to report to an external entity like a state regulatory authority. See 42 U.S.C. § 299b-21(7)(B). Although PSQIA is a federal statute, and although state courts like the Florida

Supreme Court have addressed the PSQIA privilege, this Court has never weighed in on the proper interpretation of PSQIA or the scope of PSQIA's relevant exception. See Charles v. S. Baptist Hosp. of Fla., Inc., 209 So. 3d 1199 (Fla. 2017); Tallahassee Mem'l Healthcare, Inc. v. Wiles by and through Wiles, 351 So. 3d 141 (Fla. 1st DCA 2022), rev. granted, 2023 WL 3816758 (Fla. June 5, 2023).

Here, BMG and St. Joseph's asserted the PSQIA privilege to protect critical documents created during their patient-safety analysis. In reviewing this claim of privilege, the district court held, without reference to the text of PSQIA's narrow exception, that the records created as part of the patient-safety process were not privileged because the documents appeared to have been used for other purposes, including internal peer review, quality control, and risk management. But the text of PSQIA contains no such qualifier on the internal uses of patient-safety documents, and the relevant agency guidance implementing the statute expressly permits these uses without compromising the privilege.

Thus, the question of statutory interpretation presented by this petition is: does PSQIA's limited exception for "information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system" swallow what Congress intended to be a broad privilege, and leave patient-safety analysis documents unprotected, just because a healthcare organization may also use

these documents for related additional internal purposes, such as quality control and peer review?

## III. FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED

Dr. Loux is a former BMG employee who held surgical privileges as part of St. Joseph Hospital's Medical Staff and contracted with St. Joseph's to provide medical director services.[2] (See Dkt. No. 26 ¶¶ 11, 14). Both St. Joseph's and BMG are part of BayCare Health System, Inc. ("BayCare"), which at the time of this lawsuit's filing operated approximately 14 hospitals with 3,482 hospital beds, 18 urgent care centers, 5 surgery centers, 12 outpatient imaging facilities, 124 physician practice locations, and 33 walk-in care facilities in Publix supermarkets. (Id. ¶ 8).

While working as a surgeon at St. Joseph's, Dr. Loux committed serious surgical errors in procedures she performed on the bowels of pediatric patients. (See Dkt. No. 36 ¶ 25). These errors occurred on back-to-back days. Dr. Loux conceded that both errors constituted "never events," meaning they should never occur in a surgeon's practice. (See id.). These two never events resulted in her surgical performance being reviewed by the Peer Review Committee of the Medical Staff of St. Joseph's. (See id. ¶ 29). Dr. Loux ultimately lost her employment with BMG and

---

[2] The parties disagree whether St. Joseph's employed Dr. Loux within the meaning of Title VII in relation to their contractual relationship. (See Dkt. No. 36 ¶ 14).

her privileges with St. Joseph's, to which she responded by filing the underlying lawsuit. (See Dkt. Nos. 1, 26).

Early in the litigation, Dr. Loux served a request for production on BMG and St. Joseph's, seeking information about complaints against specified physicians. BMG and St. Joseph's identified the documents that are now at issue here—Quality Files and Referral Logs—as potentially responsive but containing privileged patient-safety information. Dr. Loux sought this information to compare BMG's and St. Joseph's treatment of her compared to their treatment of other physicians. St. Joseph's and BMG objected to the production of the Quality Files and Referral Logs because they are privileged under PSQIA. (See Dkt. Nos. 50 at 10-14, 51 at 9-13).

**The Patient Safety and Quality Improvement Act of 2005 ("PSQIA").**

PSQIA is a federal statute that allows healthcare providers to openly discuss, learn from, and rectify medical errors without having to fear that the information will be used against them in court. See 151 Cong. Rec. S8713-02, S8713, 2005 WL 1703486. It encourages providers to voluntarily collect and share patient-safety-related information with external organizations known as Patient Safety Organizations ("PSOs"). See id. A provider reports information to the PSO about patient-safety-related events and in return has access to information that the PSO collects about trends in patient safety. See 151 Cong. Rec. H6673-01, H6676, 2005 WL 1771386. The provider and PSO can then work together to identify, mitigate,

and eliminate risks in the care process by developing process improvements to the provider's staff, all to improve patient safety. Id.

The system depends heavily on physicians reporting things that did not go according to plan during a procedure as well as patient outcomes from a procedure that fall outside the expected range. Of course, any physician who makes such a report worries about the risk of facing a malpractice lawsuit. And any physician who offers an opinion about the care provided by a peer worries about facing litigation from a peer who disagrees with their assessment.

PSQIA takes those concerns off the table by promising that the reports are strictly privileged. Physicians know they are not creating a "tidy package of information" that would be used against them in court. See 150 Cong. Rec. S8222, 8222-8223 (daily ed. July 15, 2004) (statement of Sen. Enzi).

Here is just a portion of this broad statutory privilege, which is the subsection at issue: "Notwithstanding any other provision of Federal, State, or local law and subject to [enumerated exceptions], patient safety work product shall be privileged and shall not be . . . (2) subject to discovery in connection with a Federal, State, or local civil, criminal, or administrative proceeding, including in a Federal, State, or local civil or administrative disciplinary proceeding against a provider . . . ." 42 U.S.C. § 299b-22(a).

**BayCare's PSQIA-compliant patient safety evaluation system.**

Pursuant to PSQIA, BayCare collects and shares data with PSOs using an information-sharing system that is a "Patient Safety Evaluation System." See 42 U.S.C. § 299b-21(7)(A). For efficiency reasons, all BayCare entities, including BMG and St. Joseph's, participate in that patient safety evaluation system. (See Dkt. Nos. 62-1 ¶¶ 5-8, 106-1 ¶¶ 5-6). BayCare's patient safety evaluation system collects information from various sources, analyzes whether that information presents significant patient-safety concerns, and then reports such concerns to its PSO. (Dkt. No. 106-1 ¶¶ 5-6).

The design of BayCare's patient safety evaluation system explains how the two types of documents Dr. Loux is seeking—Referral Logs and Quality Files—come to be, including how they are stored in rlDatix, the secure electronic database that exclusively houses BayCare's patient safety evaluation system. (See Dkt. Nos. 62-1 ¶¶ 21-22, 32, 40; 71-1 ¶ 4; 106-1 ¶ 5). The system design also shows how BayCare keeps other types of information, such as minutes of peer review committee meetings, completely separate from the patient safety evaluation system.

Turning to those design specifics, three departments have primary responsibility for the flow of information into rlDatix: the Customer Experience Department, the Quality Department, and the Clinical Risk Department. (See Dkt. No. 71-1 ¶¶ 29-32). Some information comes from complaints made by patients or

their families. (See Dkt. Nos. 62-1 ¶¶ 25-27, 71-1 ¶ 30). Those complaints are first assessed by St. Joseph's Customer Experience Department because many do not involve the provision of care; rather, they involve something like a billing issue or cancellation of an appointment. (See Dkt. No. 71-1 ¶¶ 30-31, 36). But, if the complaint could involve a patient-safety concern, it is routed to the Quality Department. (Id. ¶ 31).

The Quality Department is staffed by Quality Care Coordinators. (Dkt. 106-1 ¶ 11). Quality Care Coordinators receive a steady flow of information from multiple sources, including information provided by various clinical departments within the hospital. (See id. ¶ 12; Dkt. Nos. 62-1 ¶ 28, 71-1 ¶¶ 6, 30). Coordinators review the information to determine which of that information requires further action, including potential reporting to the Clinical Risk Department. (See Dkt. Nos. 50-2 ¶¶ 5-6, 71-1 ¶ 31, 106-1 ¶ 11).

Coordinators track their receipt of referrals in a Referral Log. (Dkt. No. 106-1 ¶ 13). In most instances, referrals result in the creation of a separate Quality File, which is essentially a screen that opens in rlDatix (when exported for review by the district court, they appeared in spreadsheet form). (Id. ¶ 15). The Quality File describes the nature of the referral and records the steps taken by a Coordinator to analyze that referral. (Id. ¶¶ 16, 22-23).

Those steps may include seeking input from a physician's department head about whether the physician deviated from the standard of care. (Dkt. No. 106-1 ¶¶ 27-28). The Coordinator typically records that input within the Quality File. (<u>See</u> <u>id.</u> ¶ 28). Coordinators often loosely call this input "peer review," although it is a far cry from the formal peer review done by the Peer Review Committee of St. Joseph's Medical Staff when patient-care issues necessitate the review of a physician's privileges. (<u>See</u> Dkt. No. 106-1 ¶¶ 39-47). The Coordinator then records what steps have been taken to rectify the concern. (<u>See</u> <u>id.</u> ¶¶ 29-35). If the concern involves patient safety and is significant enough, the Coordinator can forward that concern to the Clinical Risk Department. (<u>See</u> Dkt. No. 62-1 ¶ 27, 71-1 ¶¶ 31-32).

The Clinical Risk Department sits at the end of the patient safety evaluation system's chain of analysis. (<u>See</u> Dkt. No. 62-1 ¶ 13). The Clinical Risk Department oversees the module in rlDatix where BayCare keeps Event Reports. (<u>See</u> Dkt. Nos. 62-1 ¶¶ 8, 27-30; 71-1 ¶¶ 7-9). An Event Report describes a particular event that may present a significant patient-safety concern and can be created by a team member with knowledge of that event. (<u>See</u> Dkt. Nos. 62-1 ¶¶ 28-30, 71-1 ¶¶ 6-9). Every Event Report that is entered into rlDatix is forwarded to BayCare's PSO. (Dkt. Nos. 62-1 ¶ 34, 71-1 ¶ 12).

To recap, all three facets of the patient safety evaluation system—Customer Experience, Quality Care, and Clinical Risk—interlock to help BayCare protect

patient safety. The Customer Experience team filters out potential care issues from non-patient-safety feedback and forwards relevant reports. (See Dkt. Nos. 62-1 ¶¶ 25-27, 71-1 ¶¶ 30-32). The Quality Care Coordinators oversee the tracking and processing of the information, while operating as trained clinicians to identify and escalate safety issues, often asking department heads to contribute their perspective on physicians' performance. (See Dkt. No. 106-1 ¶¶ 5-6, 11-16, 22-35). Serious concerns are then routed to the Clinical Risk Department, which is responsible for reporting those concerns to the PSO, receiving feedback from the PSO, and then working to develop new protocols or initiatives to address potential deficiencies and keep patients safe. (See Dkt. No. 62-1 ¶¶ 28-35). In sum, the system is designed to collect information, to rely on the collective judgment of multiple participants to sort and analyze that information, and to act on those observations to produce useful improvements. (See Dkt. Nos. 62-1 ¶¶ 7-8, 106-1 ¶ 6).

BayCare's entire process is intended to create a self-reflective, improvement-focused culture of care, which is exactly what Congress said it wanted when it passed PSQIA. See 151 Cong. Rec. H6673-01, H6676, 2005 WL 1771386. But of course, Congress also clarified in PSQIA that it wanted providers to continue to comply with their independent obligations under state law. See Department of Health Human Services, Patient Safety and Quality Improvement, 73 Fed. Reg. 70,741, 70743-44 (Nov. 21, 2008).

In recognizing that the State of Florida also has a legitimate interest in patient safety, BayCare has taken pains to meet that goal as well. In operating its patient safety evaluation system, BayCare ensures that it does not use the confidential and privileged nature of this system to escape the external reporting obligations that it owes to the State. (See Dkt. Nos. 50-2 ¶ 14; 62-1 ¶¶ 36-37, 40; 160-1 ¶¶ 7-10).

For example, Florida law requires BayCare to report certain serious adverse patient outcomes (e.g., death, brain injury, etc.) to AHCA within 15 days. See Fla. Stat. § 395.0197(7). BayCare complies with this external obligation by separately creating "Code 15 reports." (Dkt. Nos. 62-1 ¶ 36, 160-1 ¶¶ 9-10). This process does not require BayCare to remove privileged information from its patient safety evaluation system. Instead, BayCare uses AHCA's own reporting portal to input the information directly into AHCA's system. (Dkt. Nos. 62-1 ¶ 36, 160-1 ¶ 10). BayCare typically keeps a copy of the completed form, which is not generated by rlDatix, outside the patient safety evaluation system. (Dkt. No. 62-1 ¶ 36).

In another example, Florida law requires BayCare to maintain agendas and minutes of its formal peer review of a physician's privileges to determine whether the physician can practice safely. See Fla. Stat. § 395.0193(2). If St. Joseph's Peer Review Committee is convened, BayCare maintains and creates those meeting agendas and minutes separately. See Fla. Stat § 395.0193(2); (Dkt. No. 106-1 ¶¶ 42-

43). They are not placed into the patient safety evaluation system. (Dkt. No. 106-1 ¶ 43).

As these facts show, when state law mandates an external reporting obligation, BayCare takes pains to comply with those obligations using documents maintained separately from the PSQIA patient safety evaluation system. BayCare has never used any of the patient safety work product kept in rlDatix to meet any external reporting obligation. (See Dkt. Nos. 62-1 ¶ 40, 106-1 ¶¶ 8-10).

## PSQIA's impacts on discovery in this case.

Returning to the facts of this case, the privilege dispute centers on the Quality Files and Referral Logs created by St. Joseph's Quality Care Coordinators. When BMG and St. Joseph's objected to the production of those documents, Dr. Loux moved to compel. (See Dkt. Nos. 39, 40). The magistrate judge agreed that the Quality Files and Referral Logs were privileged under PSQIA. (See Dkt. Nos. 66, 82 at 9-16). Dr. Loux filed objections to the magistrate judge's report and recommendation, BMG and St. Joseph's responded, and the district court held a hearing. (See Dkt. Nos. 93, 94, 95). The district court then ordered BMG and St. Joseph's to submit the Quality Files for in camera review.[3] (Dkt. No. 96).

---

[3] Because these are privileged and confidential documents, Petitioners have not included the documents with the appendix to this petition; however, Petitioners are happy to provide them at this Court's direction.

**The district court orders production.**

After completing this initial review, the district court ordered BMG and St. Joseph's to produce the Quality Files and to also submit the Referral Logs for in camera review. The district court found that the Quality Files were not privileged under PSQIA because they had a "dual purpose." That is, even though BayCare created the Quality Files as part of its patient safety evaluation system, the district court said that section 395.0193(2), Florida Statutes, also required BayCare to create this information. (See Dkt. No. 103 ¶4).

Section 395.0193(2) is the example referenced above, supra at 12, that requires healthcare organizations to adopt procedures for formal peer review and maintain agendas and minutes of peer review committee meetings. The Florida statute does not mention the creation of any documents like the Quality Files and Referral Logs. See Fla. Stat. § 395.0193(2).

Petitioners then submitted the Referral Logs for in camera review, (Dkt. No. 108), and moved for reconsideration of the court's ruling requiring production of the Quality Files. (Dkt. No. 106). On top of arguing that the district court had misinterpreted PSQIA, Petitioners' reconsideration motion also pointed out that Florida law did not require creation of Quality Files. Nor had the State of Florida ever asked for or sought production of Quality Files from BayCare.

The district court denied reconsideration. (Dkt. No. 112). Pivoting from its focus on section 395.0193(2), which it originally relied on, the district court instead claimed that BayCare's use of the information in the patient safety evaluation system for still other purposes invalidated the privilege. (Id. at 3-6). It also identified a policy-based concern that Dr. Loux would be "unable to have proper litigation discovery." (Id. at 4).

The district court ordered Petitioners to produce the Referral Logs. (Dkt. No. 115). Petitioners requested that the district court certify the privilege issue for interlocutory review under 28 U.S.C. § 1292(b). (Dkt. No. 118). The district court denied this request, but entered a stay for 45 days to allow this Court to weigh in. (Dkt. Nos. 120, 128). This petition followed.

## IV.    REASONS WHY THE WRIT SHOULD ISSUE

The district court erred in its analysis and application of the PSQIA privilege. The court substituted its policy views about how the privilege should apply for the text of the statute enacted by Congress. Mandamus is appropriate and necessary to correct this interpretive error and to protect Petitioners' privileged files.

### A.    The district court erred in interpreting PSQIA's text.

The district court's primary error was failing to faithfully cite, discuss, and apply PSQIA's text. To understand how the district court went astray in its statutory analysis, it helps to first understand PSQIA in more detail.

**PSQIA provides a broad privilege.**

Congress enacted PSQIA in the wake of a 1999 study finding that as many as 98,000 patients died annually from preventable medical errors. Until that time, "few in the health-care field appreciated that many of the reasons for patient safety events were due to the failure of organizations and practitioners to systematically identify, analyze, and take appropriate action against preventable risks, and serious adverse events or risks thereof were not routinely reported or shared among providers for fear of reprisal, shame, or litigation." Wiles, 351 So. 3d at 153 (B.L. Thomas, J., concurring).

As previously noted, PSQIA combats this tragic statistic by encouraging healthcare providers to voluntarily collect and share patient-safety-related information with Patient Safety Organizations. See 151 Cong. Rec. S8713-02, S8713, 2005 WL 1703486. A provider reports information to the PSO about patient-safety-related events and in return has access to information that the PSO collects about trends in patient safety. See 151 Cong. Rec. H6673-01, H6676, 2005 WL 1771386.

Congress incentivized physicians to create these reports that would not otherwise exist by promising the reports would be strictly privileged in all litigation, including employment discrimination cases. See, e.g., Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 535 (Tenn. 2010) (noting that PSQIA created a "tightly crafted

federal privilege"); <u>Tinal v. Norton Healthcare, Inc.</u>, 2014 WL 12581760, at *11 (W.D. Ky. 2014) ("[T]he statute speaks in plain, unequivocal terms that encompasses all federal, state, or local civil or criminal proceedings."); <u>Franco v. Yale New Haven Hosp., Inc.</u>, 2023 WL 2769929, at *9-12 (Conn. Super. Ct. Mar. 31, 2023) (adopting the reasoning in <u>Tinal</u> that PSQIA applies to all actions, including employment discrimination cases).

Here again is the applicable subsection of the much broader statutory privilege: "Notwithstanding any other provision of Federal, State, or local law and subject to [enumerated exceptions], patient safety work product shall be privileged and shall not be . . . (2) subject to discovery in connection with a Federal, State, or local civil, criminal, or administrative proceeding, including in a Federal, State, or local civil or administrative disciplinary proceeding against a provider . . ." 42 U.S.C. § 299b-22(a).

As the text reveals, PSQIA recognizes that "[t]o encourage voluntary reporting of patient safety events by providers, the protections must be substantial and broad enough so that providers can participate in the system without fear of liability or harm to reputation." Safety and Quality Improvement, 73 Fed. Reg. 70,741 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3). For that reason, PSQIA prevents providers' reports and opinions from ever being used against them in any civil or criminal proceeding. That allows physicians to move past their self-preservation

instinct and focus instead on the need for robust and self-critical analysis to protect patient safety.

Under PSQIA, the applicability of the privilege hinges on whether the information is "patient safety work product." PSQIA broadly defines patient safety work product to include information reported to a PSO or any information that identifies the deliberations or analysis conducted within the healthcare organization's patient safety evaluation system to determine whether reporting is necessary. See 42 U.S.C. § 299b-21(7)(A).

### BayCare's records here fit within PSQIA's broad privilege.

PSQIA's definition of patient safety work product applies neatly to the Quality Files and Referral Logs here. Petitioners assembled the Quality Files and Referral Logs within BayCare's patient safety evaluation system to record the deliberations and analysis of personnel tasked with determining whether various issues might impact patient safety or quality of care. (Dkt. Nos. 62-1 ¶¶ 7-8, 71, 106-1 ¶¶ 5-6). It is undisputed that BayCare created and held these documents within its patient safety evaluation system. It is undisputed that they were located in the secure electronic database that houses patient safety evaluation system information. And it is undisputed that these documents reflect the analysis necessary for BayCare to sort through large volumes of information to cull out what needs to be reported to the

PSO. The Quality Files and Referral Logs thus constitute patient safety work product under PSQIA.

In its order denying the motion for reconsideration, the district court appeared to suggest that these documents were not patient safety work product because they were not actually reported to a PSO. (Dkt. No. 112 at 2). That is wrong. PSQIA does not require information to actually be reported to a PSO to qualify as patient safety work product. Rather, as the text makes clear, any information that identifies the deliberations or analysis conducted within the healthcare organization's patient safety evaluation system to determine whether reporting is necessary also qualifies. See 42 U.S.C. § 299b-21(7)(A); see also Tibbs v. Bunnell, 448 S.W.3d 796, 802 (Ky. 2014) ("[A]s the statutory language indicates, the privilege also extends to certain types of information and data underlying, supporting or triggering such [a self-examining analysis].").

Because the Quality Files and Referral Logs meet PSQIA's definition of patient safety work product, they must be treated as privileged unless they fit within a statutory exception. The sole exception at issue here is PSQIA's statement that a document is not privileged if it is collected, developed, or maintained "separately" from the healthcare organization's patient safety evaluation system. See 42 U.S.C. § 299b-21(7)(B). To determine whether the Quality Files or Referral Logs fall within this exception, the district court needed only address the simple textual question of

whether these documents were collected, developed, or maintained "separately" from BayCare's patient safety evaluation system. The district court's analysis missed the mark because it strayed from the statutory text. Nowhere did the district court even attempt to analyze the "separateness" of these records from the patient safety evaluation system.

## The district court's analysis of PSQIA ignored the text.

If the district court had properly applied the statute's definition of patient safety work product and the relevant "separateness" exception, it would have quickly realized that this case presented an easy question with an easy answer. "Separately" means "Individual; distinct; particular; disconnected." <u>Separate</u>, <u>Black's Law Dictionary</u> (6th ed. 1990). But as already explained, the Quality Files and Referral Logs were part-and-parcel of the patient safety evaluation system. They were assembled and developed within that system, and they were maintained within the secure database that houses all information collected and developed in that system. In other words, there was nothing "disconnected" from these records and the patient safety evaluation system. The records were not created "apart from" or "not together with" the patient safety evaluation system. They were created and maintained wholly within it. They are, therefore, privileged. It is as simple as that.

The district court dodged this proper statutory analysis by focusing on how the records were used, rather than on how the records were created and maintained.

The district court's original order declining to apply the PSQIA privilege said that Petitioners' documents could not be protected by the privilege because they were "dual-purpose" records that Petitioners were "required to make under the Florida Statutes." (Dkt. No. 103 at 3). The district court's order on reconsideration doubled down on this reasoning by noting that the records have "multiple uses," including peer review, risk management, and "answering outside questions." (Dkt. No. 112 at 2-6).

Of course, PSQIA itself says nothing about a "dual purpose" exception to the privilege. Nor does the term "dual purpose" appear anywhere in the relevant HHS regulations upon which healthcare organizations rely for implementation of the statute. See, e.g., Safety and Quality Improvement, 73 Fed. Reg. 70732-01 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3); HHS Guidance, 81 Fed. Reg. 32655-01, 32656, 2016 WL 2958759 (May 24, 2016).

In fact, as a matter of law, there is no applicable restriction on the internal uses of patient safety work product by a provider. See, e.g., Tibbs, 448 S.W.3d at 800 (noting that PSQIA "encourage[s] health care providers to voluntarily associate and communicate privileged patient safety work product...among themselves through in-house patient safety evaluation systems"). The HHS regulations make this clear. See Safety and Quality Improvement, 73 Fed. Reg. 70,778-79 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3) (stating that PSQIA "does not regulate uses of patient safety work

product within a single legal entity" and "patient safety work product may be used for any purpose within the legal entity").

Yet this atextual phrasing has found its way into several cases, most prominently the Florida Supreme Court's opinion in Charles v. South Baptist Hospital of Florida, Inc., 209 So. 3d 1199, 1206 (Fla. 2017). See also Dence v. Wellpath, LLC, No. 1:20-cv-671-CL, 2022 WL 17261990, at *3 (D. Or. Nov. 29, 2022) (rejecting PSQIA privilege claim because the documents were used for a "dual purpose"). In Charles, the issue was whether adverse incident reports are covered by the PSQIA privilege. In arguing against application of the privilege, the medical-malpractice plaintiff argued, and the state trial court found, that the statutory "separateness" exception applied because the adverse incident reports had been "collected or maintained for a purpose other than submission to a patient safety organization or for dual purposes." Charles, 209 So. 3d at 1206. The "dual" purpose in Charles was a series of Florida statutes and rules that "require a health care provider to create and maintain adverse medical incident reports." Id. at 1211 (citing Fla. Stat. § 395.0197(4)-(7)).

Concerned about the policy ramifications of allowing hospitals to "determine for themselves what information was available in litigation through their own strategic use" of PSQIA, "by placing all of their reports, regardless of any other state requirements, in the patient safety evaluation system," the Florida Supreme Court

found that the reports were not privileged under PSQIA "because Florida statutes and administrative rules require providers to create and maintain them." Id. at 1214, 1216. Put differently, the Florida court held that PSQIA does not protect documents that should have been created or maintained under state law, even if those documents were actually created and maintained within the patient safety evaluation system.

This atextual approach to PSQIA's text was wrong as a matter of statutory interpretation because PSQIA focuses only on where the records were actually created and maintained, not on how they should have been created and maintained or on how they were used. Focusing the inquiry on whether documents have "dual" or "multiple" purposes, as the district court did here, bears no relationship to the language of PSQIA and is fundamentally imprecise, because documents created for a patient-safety purpose and held within a patient safety evaluation system can also serve other internal purposes without losing the protection of the privilege. See Safety and Quality Improvement, 73 Fed. Reg. 70,742 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3) (explaining that "[a]ll of this information, collected in one patient safety evaluation system, is protected as patient safety work product unless the provider determines that certain information must be removed from the patient safety evaluation system for reporting to the state" and that "[t]he final rule does not limit persons from conducting additional analyses for any purpose…."). Instead, because the text of PSQIA is unambiguous, all that really matters is whether the

documents were created and maintained "separately" from the patient safety evaluation system. And again, these documents were not. That means the documents are privileged.

### The district court misapplied the PSQIA privilege.

But even moving beyond the district court's broad interpretive error, the district court was still wrong in its application of PSQIA to this case. Unlike the adverse incident reports in <u>Charles</u>, there are no Florida statutes or rules requiring BMG and St. Joseph's to create and maintain Quality Files or Referral Logs.

The district court said that Florida's peer-review statute, section 395.0193(2), provided the source of that obligation. (Dkt. No. 103 at 3). But nothing in section 395.0193(2) identifies or describes Quality Files or Referral Logs, much less requires Petitioners to create or maintain them. In fact, when complying with section 395.0193(2), BayCare has never included Quality Files or Referral Logs in its reporting, nor has the State ever asked for them. (<u>See</u> Dkt. No. 106-1 ¶¶ 8-10; <u>see also</u> Dkt. No. 62-1 at ¶ 40).

Instead, section 395.0193(2) contains only two reporting or recordkeeping requirements. First, it requires hospitals to create procedures for peer review. <u>See</u> Fla. Stat. § 395.0193(2)(b). Second, it requires hospitals to keep copies of "agendas and minutes" for the meetings of their peer-review panels "for review by the Division of Health Quality Assurance of the agency." <u>See</u> Fla. Stat.

§ 395.0193(2)(e). Quality Files and Referral Logs do not fit either of those descriptions. Thus, because the Florida peer-review statute does not require these records to be created or maintained, they remain privileged even under the district court's interpretive approach. See Wiles, 351 So. 3d at 149-50 (Fla. 1st DCA 2022) (holding that records were privileged under PSQIA because they were not sent to any state regulatory authority and were not required to be created under state law).

This conclusion is consistent with the HHS guidelines implementing the statute. Those guidelines explain that documents are privileged unless they should have been created in response to a mandatory external reporting requirement. See HHS Guidance, 81 Fed. Reg. 32655-01, 32657-58, 2016 WL 2958759 (May 24, 2016). The guidelines similarly make clear that providers are not limited in internally sharing patient-safety information so they are able to "prevent[] or ameliorat[e] patient harm" through processes like peer review and risk management. Safety and Quality Improvement, 73 Fed. Reg. 70,778 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3); see also Kathryn Leaman, Let's Give Them Something to Talk About: How the PSQIA May Provide Federal Privilege & Confidentiality Protections to the Medical Peer Review Process, 11 Mich. St. U. J. Med. & L. 177 (Winter 2007).

But even if there were a clear and unequivocal reporting obligation here, the HHS guidelines add that there may be situations where uncertainty remains as to whether information or documents being kept in the patient safety evaluation system

are needed to meet that reporting obligation. In such an instance, providers may treat those documents as privileged unless and until it becomes clear that the documents are needed to meet the external reporting obligations. Safety and Quality Improvement, 73 Fed. Reg. 70,742 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3). Thus, even if the district court had correctly read into section 395.0193(2) a reporting obligation for documents other than agendas and minutes, the district court should still have analyzed whether BayCare was reasonably unsure about whether the Florida statute applied to the Quality Files and Referral Logs. Put differently, the district court could not fault BayCare for placing these documents in the patient safety evaluation system when AHCA had never asked for them.

HHS provides this flexibility so that providers need not maintain costly, complex, and duplicative recordkeeping and patient-safety systems—one for information that is clearly not needed for an external purpose and one for information as to which there is some remote possibility of a future need. See Safety and Quality Improvement, 73 Fed. Reg. 70,741-42 (Nov. 21, 2008) (codified at 42 C.F.R. pt. 3).

In short, even if the district court believed that there were a reporting obligation that should have become clear to Petitioners at some point, the district court still needed to examine whether Petitioners retained the right to choose between using the drop-out procedure contemplated by the federal regulations or creating new information to satisfy the reporting obligation. If Petitioners could have

chosen to create a new document or report to satisfy the applicable external obligation rather than turning over the Quality Files and Referral Logs, then the district court had no right to take that choice away from them and mandate that BMG and St. Joseph's produce the Quality Files and Referral Logs.

**B.**     **The district court erred when it nullified the PSQIA privilege based on a policy concern about Dr. Loux's ability to conduct discovery.**

The district court also found the PSQIA privilege inapplicable here because it found that otherwise, Dr. Loux would be "unable to have proper litigation discovery." (Dkt. No. 112 at 4). This is an outcome-oriented approach that is inappropriate in the analysis of a statutory privilege.

To that end, this Court has warned that a court "cannot justify finding a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant." Cox v. Admin. U.S. Steel & Carnegie, 17 F.3d 1386, 1419 (11th Cir. 1994). Even if Dr. Loux would find the Quality Files and Referral Logs relevant, that does not mean she is "unable to have proper litigation discovery." She has other options available to her. For one, she can depose the decisionmakers who terminated her, the physicians she claims were treated differently to determine whether their surgical errors were as serious as her errors, or the physicians who were charged with supervising her performance. For another, she could request non-privileged records, such as the relevant "Code

15" reports produced by BayCare for reporting to the relevant regulatory authorities, which she already requested and received.

Here, Congress encouraged providers to create patient-safety information systems in which the self-critical files that might not otherwise be created would remain confidential and not subject to discovery. PSQIA's point is to encourage reports of potential incidents to reduce medical errors by assuring doctors that they would not be creating a "tidy package of information that a personal injury lawyer could use against them in court." See 150 Cong. Rec. S8222, 8222-8223 (daily ed. July 15, 2004) (statement of Sen. Enzi). BayCare relied on that statutory promise when it established its patient safety evaluation system and created patient safety work product like the Quality Files and Referral Logs.

Dr. Loux has discovery options. Meanwhile, the district court cited no legal authority to support the notion that it could trample upon a privilege based solely on a concern about those options. This was error.

### C. The district court's ruling created immediate and irreversible harm that is not mitigated by the existence of a protective order.

Petitioners understand that mandamus relief is an extraordinary remedy, but it is the appropriate remedy here. Failure by this Court to grant immediate relief means that information created by physicians in the belief they would receive the "substantial and broad" protection promised by Congress will be immediately turned over to Dr. Loux. Some of that information was created by physicians who were

being asked to criticize their peers. Other parts of that information may reveal complaints by staff members about physicians they worked with. Dr. Loux will then use that privileged information to depose the physicians and staff members who provided it.

The fact that the district court's confidentiality order may prevent third parties from finding out about the information, while helpful, does not remedy the fact that the physicians and staff members will face questioning by counsel for Dr. Loux about comments that they were encouraged to make candidly based on a statutory promise that they would not end up having to defend them in litigation.

In each case, Petitioners expect that the physicians and staff members will have the same question: "didn't you, BMG and St. Joseph's, promise that this information would be confidential and privileged and you wouldn't produce it to anyone?" And when the physicians and staff members realize that Petitioners have been unable to keep that promise, their trust in the confidential nature of the patient safety evaluation system will evaporate. And as their stories circulate throughout the system, the trust of other physicians and staff members will likewise be affected.

This loss of trust will have immediate and profound implications for the culture of safety that BayCare and other healthcare organizations have attempted to create and that PSQIA desires. It will lead to physicians and staff members being hesitant to report information that may create litigation risks. It will make

supervising physicians hesitant to offer their full and unvarnished assessment of the performance of their peers.

Petitioners also have an important interest in obtaining an immediate remedy. When Petitioners encourage physicians to be candid about the performance of their peers and about potential deviations from the standard of care, they are creating information that will help their opponents in a variety of lawsuits. If Petitioners and other healthcare organizations that learn about the district court's ruling are required to govern themselves by the standards announced by the district court for the next few years while this litigation winds down—until Petitioners can appeal this ruling as of right—they will potentially be creating mountains of discoverable self-critical information in their patient safety evaluation system. To prevent other courts from following the district court's lead and declaring such information unprotected by the PSQIA privilege, Petitioners will have to embark on an immediate and massive effort to restructure their patient-safety system. All of this will be conducted in an environment of great legal uncertainty as to whether Petitioners should follow HHS guidance or the contrary principles announced by the district court.

The Supreme Court has said that a writ of mandamus can function as a useful "safety valve" for promptly correcting serious errors. Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 111 (2009). In the words of the D.C. Circuit:

> [A]ppeal after final judgment will often come too late because the privileged materials will already have been released. In other words,

"the cat is out of the bag." In re Papandreou, 139 F.3d 247, 251 (D.C. Cir. 1998). As this Court and others have explained, post-release review of a ruling that documents are unprivileged is often inadequate to vindicate a privilege the very purpose of which is to prevent the release of those confidential documents. See id.; see also In re Sims, 534 F.3d 117, 129 (2d Cir. 2008) ("a remedy after final judgment cannot unsay the confidential information that has been revealed") (quoting In re von Bulow, 828 F.2d 94, 99 (2d Cir. 1987)).

In re Kellogg Brown & Root, Inc., 756 F.3d 754, 761 (D.C. Cir. 2014).

## V.    CONCLUSION

For all these reasons, this Court should issue a writ of mandamus vacating the district court's orders requiring production of documents privileged under PSQIA. (Dkt. Nos. 103, 112, 115).

|  | **/s/Kevin D. Johnson** |
| **Ceci C. Berman** | **Kevin D. Johnson** |
| Florida Bar No. 329060 | Florida Bar No. 0013749 |
| **Joseph T. Eagleton** | **Ashley T. Gallagher** |
| Florida Bar No. 98492 | Florida Bar No. 125141 |
| Brannock Berman & Seider | Johnson Jackson PLLC |
| 1111 W. Cass St., Ste. 200 | 100 N. Tampa St., Ste. 2310 |
| Tampa, FL 33606 | Tampa, FL 33602 |
| Tel: (813) 223-4300 | Tel: (813) 580-8400 |
| Fax: (813) 262-0604 | Fax: (813) 580-8407 |
| cberman@bbsappeals.com | kjohnson@johnsonjackson.com |
| jeagleton@bbsappeals.com | agallagher@johnsonjackson.com |
| Secondary: eservice@bbsappeals.com | Secondary: lesposito@johnsonjackson.com |

*Attorneys for Petitioners*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

1.      This document complies with the type-volume limit and the word limit of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,178 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using the word processing system Microsoft Word and using font size 14 Times New Roman.

*/s/ Kevin D. Johnson*
**Kevin D. Johnson**
Florida Bar No. 0013749
Attorney for Petitioners

## CERTIFICATE OF SERVICE

The undersigned counsel of record certifies that the foregoing to filed with the clerk of court and a copy of the foregoing was furnished via Email this 8th day of August, 2023, to The Honorable William F. Jung and the following:

**John D. Goldsmith**
**Amy L. Drushal**
Trenam, Kemker, Scharf, Barkin, Frye, O'Neill, & Mullins, P.A.
101 E. Kennedy Blvd., Suite 2700
Tampa, FL 33602
Email: jgoldsmith@trenam.com
      idawkins@trenam.com
      svanboskerck@trenam.com
      aldrushal@trenam.com
      lbehr@trenam.com

**Terin Barbas Cremer**
Barbas Cremer, PLLC
209 S. Packwood Avenue
Tampa, FL 33606
Email: tcremer@barbascremer.com

*/s/ Kevin D. Johnson*
**Kevin D. Johnson**
Florida Bar No. 0013749
Attorney for Petitioners
